## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 14 2015, 6:04 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Cynthia Phillips Smith
Law Office of Cynthia P. Smith
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of: B.C.M. (Minor Child),

and

C.J.C.M. (Mother),

*Appellant-Respondent*,

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*.

August 14, 2015

Court of Appeals Case No. 79A02-1412-JT-895

Appeal from the Tippecanoe Superior Court

The Honorable Thomas K. Milligan, Senior Judge

Trial Court Cause No. 79D03-1407-JT-31

**Brown, Judge.**

[1] C.J.C.M. ("Mother") appeals the involuntary termination of her parental rights with respect to B.C.M. ("Child"). Mother raises one issue, which we revise and restate as whether the evidence is sufficient to support the termination of her parental rights. We affirm.

## Facts and Procedural History

[2] On October 5, 2013, Tippecanoe County Department of Child Services ("DCS") received a report alleging Child, who was six months old at the time, was being neglected by Mother. Specifically, the report alleged that on that day police officers responded to a disturbance at a home in Lafayette, Indiana, and Mother, who was twenty years old at the time, was found to be intoxicated. Mother later admitted to drinking and using marijuana on that date.[1] Mother was alleged to have started an altercation with the sister of B.F., who is Child's father ("Father"),[2] in which Child was present, and when law enforcement attempted to stop the fight Mother was uncooperative with the officers and assaulted one of them. Based on this report, a family case manager visited Mother on October 10, 2013 and filed an intake officer's report. The intake officer's report indicated that Mother refused to take a drug screen without a court order, she would not provide details about her involvement in a fight at

---

[1] The DCS intake officer's report states that the home was that of Mother. Testimony at the termination hearing indicated that the altercation occurred at the home of the sister of B.F., who is Child's father.

[2] The court also terminated the parental rights of Father, referred to in the order as "Alleged Father." Appellant's Appendix at 13. Father, however, does not participate in this appeal. We therefore limit our recitation of the facts to those pertinent solely to Mother's appeal.

the residence, she would not allow family case managers to make unannounced visits without a court order, and that she had been arrested on August 16, 2013 for public intoxication and minor consumption, for which law enforcement had been contacted initially due to a fight involving Mother and an employee at "Filly's." DCS Exhibit A at 1. The intake officer's report also noted that Father was present at the home and that he denied knowing of Mother's involvement in the fight or that a fight had occurred.

[3] On October 21, 2013, DCS filed a petition alleging that Child was a Child In Need of Services ("CHINS"), and on December 11, 2013, Child was adjudicated a CHINS. That same day, the court issued a dispositional order in which it ordered that Child be made a ward of the State and be placed in foster care with his current foster placement. The court ordered Mother to participate in services, treatment, and/or supervision including random drug and alcohol screens, a drug and alcohol assessment, a parenting assessment, an anger management assessment, a psychological evaluation, to follow all recommendations from the assessments and evaluation, home based case management, and visitation.

[4] On September 11, 2014, DCS filed a petition to terminate Mother's parental rights to Child. On December 1, 2014, the court held a termination hearing at which both Mother and Father initially failed to appear but were represented by

counsel.[3]  At the hearing Kathleen Carmosin, who oversaw the case as a family case manager ("FCM"), testified that shortly after the altercation on October 5, 2013, Mother "fled to Indianapolis" without taking any clothes for Child or having any way of providing for Child's basic needs.  Transcript at 9.  She testified that after attempts to locate Mother were unsuccessful, Mother eventually returned and Child was removed on October 21, 2013.  She indicated that she first became aware of Mother because she had been the FCM who oversaw a CHINS case of Mother's mother, in which Mother's two brothers had been adjudicated CHINS, and in addition she had been involved with a previous CHINS case involving another child of Mother which ended in a voluntary termination of Mother's parental rights to that child in February 2011.

[5]  FCM Carmosin testified that Mother completed a psychological evaluation, and that Mother was recommended for individual outpatient therapy for substance abuse, individual therapy, and medication services.  She testified that Mother's attendance at individual therapy was "[n]on-existent," noting that she participated in two or three sessions at her home in Lafayette, that soon after Mother moved to Kokomo, and that, although she was referred to services in Kokomo, she did not participate in those services.  *Id.* at 12.  FCM Carmosin indicated that Mother did not participate in medication management, that

---

[3] The record reflects at some point during the presentation of the first witness, Kathleen Carmosin, Mother arrived in court, wherein page 16 of the Transcript reveals that Mother spoke out of turn during Carmosin's testimony.

Mother was referred to Child and Family Partners, and that she participated sporadically throughout the course of the case until approximately March 2014 when she began avoiding services and not participating any longer. She indicated that during the pendency of the case Mother was able to have stable housing for only "about three months" and that the longest stretch Mother had been employed was "probably four to six or four to eight weeks," in which she was employed "dancing at strip clubs." *Id.* at 13-14. FCM Carmosin testified that Mother was not able to accomplish any of her case management goals, including obtaining stable housing, employment, and parenting and other independent living skills, due to lack of participation and desertion.

[6]    FCM Carmosin further stated that, in March 2014, Mother told her home based case manager that she was going to Chicago with a couple of other women to dance to earn extra money, that she told her McDonald's employer "that she was going to have a procedure done," and that she called FCM Carmosin "to indicate that she had been kidnapped by two African-American males and taken to Illinois." *Id.* at 15. She stated that between March and August of 2014 she had no more than five conversations with Mother and that Mother was not participating in any services during that time. She indicated that when she left the case in August 2014 she did not think Mother had made sufficient progress in services that would alleviate Child's need for removal because "[a]t that time [M]other had just shown back up from being – per her report in Illinois, she had got – kind of lost her housing; I do not believe she had employment if she had been in Illinois and she had lost her employment with McDonalds at that time

so no means to support herself or [Child]." *Id.* at 23. She also noted that in mid-July of 2014 she and the CASA visited Mother, and Mother refused a drug screen.

[7] On cross-examination, FCM Carmosin testified that Mother's visitations with Child were suspended in April 2014 after she had left for Chicago and reported being kidnapped. She testified that Mother tested positive for drugs on April 12, 2014, and that she did not believe Mother submitted to a drug test after that.

[8] FCM Sarah Atchison, who took over for FCM Carmosin on the case, testified that she had reviewed the entire DCS case file prior to taking over and that during her time as FCM Mother had not participated in any services. She indicated that Mother's visitation had been suspended, that at one point Mother called and asked for visitation, and that she explained that the court would have to change its visitation order in order to grant Mother visitation. She testified that she did not know where Mother was residing and that, to her understanding, Mother had not been employed during her time on the case. She did not believe that Mother was participating in mental health treatment through DCS or otherwise. She testified that she did not believe the conditions leading to removal had been remedied and would be a threat to Child's well-being because neither parent had "adequately addressed the safety issues that led to DCS involvement and there's concerns regarding the understanding of the medical condition and supervision, and stability overall." *Id.* at 97. She testified that termination was in Child's best interest due to both parents' "lack of progress; they have been inconsistent with services, not able to provide stable

housing or to meet [Child's] basic needs throughout the case. . . . There's an instability and safety issues that are still present." *Id.* FCM Atchison noted that Child had been placed in foster care with his siblings and was doing very well in that placement. She noted that DCS had a post-termination plan of adoption by the foster parents.

[9] Mary Hood, who was the CASA appointed to the case on October 31, 2013, testified that at the beginning Mother visited with Child and "was very appropriate," but that Mother stopped visiting in April 2014 after the court ordered visitation ceased "until she had some mental issues addressed." *Id.* at 107-109. She indicated that Mother stopped communicating with her soon after visitation was ordered stopped, and after that she saw Mother only once when she and FCM Carmosin visited Mother at the Tippecanoe County Jail in July 2014. CASA Hood testified that at the Jail, she told Mother to "get her life back together" and to start services again in order to begin visitation, but was met with resistance from Mother. *Id.* at 111. She testified that she believed reunification with Mother posed a threat to Child because she did not "think the stability is there. I think . . . the parenting skills still need to be addressed." *Id.* at 118. She stated that it was in Child's best interest that Mother's parental rights be terminated for the same reasons. She also testified that she agreed with DCS's plan of adoption by foster parents.

[10] Mother was called as a witness, and she stated that she had been "diagnosed with borderline personality disorder," as well as other mental illnesses, and that she knew she needed medicine but did not have money for it. *Id.* at 124.

Although she spoke to the court at length, she did not indicate whether she had procured stable housing or employment.

[11] On December 5, 2014, the court issued its order terminating Mother's parental rights to Child (the "Termination Order").

## *Discussion*

[12] The issue is whether the evidence is sufficient to support the termination of Mother's parental rights. When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* When reviewing findings of fact and conclusions thereon in a case involving a termination of parental rights, we apply a two-tiered standard of review. *Id.* First, we determine whether the evidence supports the findings, and second whether the findings support the judgment. *Id.* We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[13] This court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.* A trial court need not wait until a child is irreversibly harmed before terminating the parent-child

relationship. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

[14] In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> * * * * *
>
> (C) that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied*. If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. *See* Ind. Code § 31-35-2-8(a).

A. *Remedy of Conditions*

[15] We note that the involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). Because we find it to be dispositive under the facts of this case, we limit our review to whether DCS established that there was a reasonable

probability that the conditions resulting in the removal or reasons for placement of the Child outside the home will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).

[16] In making such a determination, the court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). Due to the permanent effect of termination, the trial court also must evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. *Id.* The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home. *Id.* A court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* A trial court can reasonably consider the services offered by DCS to the parent and the parent's response to those services. *Id.* Further, where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve. *Id.*

[17] Mother asserts, without citation, that DCS did not meet its burden of clear and convincing evidence, noting that she "was diagnosed with a mental illness, and was not given enough time or enough intensive services to remedy her disorder," and that to the extent "[t]he reasons for removal included a lack of

employment and housing stability, [] Mother believed that she and the Father were working together to resolve those issues at the time of trial." Appellant's Brief at 10. DCS argues that "Mother fails to make a cogent argument because she does not cite to any case law supporting her assertion that DCS must prove services as part of a termination case," and that, in any event, the record reveals that she "had over a year to participate in services, but she failed to participate in the plethora of services she was provided." Appellee's Brief at 20. DCS also notes that she continued to use illegal substances and alcohol during the pendency of the case and failed to maintain contact with Child.

[18] To the extent Mother suggests that her housing and employment issues were being "resolved" at the termination hearing, Appellant's Brief at 10, our review of the record does not reveal that Mother discussed the current status of her employment and housing situations at the hearing. Moreover, FCM Carmosin testified that during the pendency of the case Mother was able to have stable housing for only "about three months" and that the longest stretch Mother had been employed was "probably four to six or four to eight weeks," in which she was employed "dancing at strip clubs." Transcript at 13-14. She testified that at the time she left the case in August 2014, Mother had lost her employment at McDonald's and had lost her housing. FCM Atchison testified that she did not know where Mother was residing and that, to her understanding, Mother had not been employed during her time on the case.

[19] Regarding Mother's arguments that DCS did not provide adequate services, the record before us reveals that DCS's efforts at providing services to Mother were

reasonable, and indeed, to the extent that Mother may have received inadequate services, it was not for lack of effort on the part of DCS. FCM Carmosin testified that Mother's attendance at individual therapy was "[n]on-existent," noting that she participated in two or three sessions at her home in Lafayette, that soon after Mother moved to Kokomo, and that, although she was referred to services in Kokomo, Mother did not participate in those services. *Id.* at 12. She testified that Mother was referred to Child and Family Partners and that she participated on and off throughout the course of the case up until approximately March 2014 when she began avoiding services and not participating any longer. FCM Atchison testified that during her time on the case Mother did not participate in any services. CASA Hood testified that Mother stopped communicating with her soon after visitation was ordered stopped, and after that she saw Mother only once when she and FCM Carmosin visited Mother at the Tippecanoe County Jail in July 2014, where she encouraged Mother to "get her life back together" and to start services again in order to begin visitation but was met with resistance from Mother. *Id.* at 111.

[20]  "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing services, in conjunction with unchanged conditions, supports a finding that there exists no reasonable probability that the conditions will change." *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. In addition, although county departments of public welfare routinely offer services to assist parents in regaining custody of their children, as DCS did in this particular case for

Mother, this court has previously explained that the law concerning termination of parental rights does not require DCS to offer such services. As long as the elements of Ind. Code § 31-35-2-4 are proven by clear and convincing evidence, termination of parental rights may occur. *In re B.D.J.*, 728 N.E.2d 195, 201 (Ind. Ct. App. 2000); *see also In re A.P.*, 734 N.E.2d 1107, 1118 (Ind. Ct. App. 2000) (stating elements required for termination of parental rights set forth in Ind. Code § 31-35-2-4 are exclusive), *reh'g denied*, *trans. denied*.

[21] Based on the foregoing, we conclude that the trial court's findings are supported by ample evidence. These findings, in turn, support the court's conclusion that there is a reasonable probability the conditions resulting in Child's removal from Mother's care will not be remedied. As previously explained, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. *In re N.Q.*, 996 N.E.2d at 392. Despite being offered extensive services, Mother has failed to make any significant improvement in her ability to care for Child. Mother's arguments on appeal amount to an invitation to reweigh the evidence, and this we may not do. *See Bester*, 839 N.E.2d at 147. In addition, it would be unfair to ask Child to continue to wait until Mother is willing to obtain, and benefit from, the help that she needs. *See In re Campbell*, 534 N.E.2d 273, 275 (Ind. Ct. App. 1989) (stating that the court was unwilling to put the children "on a shelf" until their mother was capable of caring for them).

[22] Based upon the court's findings and the record, as discussed herein, we conclude that clear and convincing evidence supports the trial court's determination that there is a reasonable probability that the conditions leading to Child's removal would not be remedied and that the court's conclusion is not clearly erroneous.

B. *Best Interests*

[23] We next consider Mother's assertion that DCS failed to demonstrate that termination of her parental rights was in Child's best interests. Mother argues that "[t]he fact that [she] allegedly cannot provide the perfect home for the child is irrelevant under the best interest standard" and that she loves Child. Appellant's Brief at 12. She asserts, again without citation, that "[s]he has remedied the conditions which resulted in the removal of her child to her best ability" and that "[i]t is clear that [she] has made some strides in both her personal stability and her ability to parent her child." *Id.*

[24] We are mindful that in determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the DCS and to the totality of the evidence. *McBride*, 798 N.E.2d at 203. In so doing, the court must subordinate the interests of the parent to those of the child. *Id.* The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.* Children have a paramount need for permanency which the Indiana Supreme Court has called a central consideration in determining the child's best interests. *In re E.M.*, 4 N.E.3d 636, 647-648 (Ind. 2014).

However, "focusing on permanency, standing alone, would impermissibly invert the best-interests inquiry . . . ." *Id.* at 648. This court has previously held that the recommendation by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158-1159 (Ind. Ct. App. 2013), *trans. denied*.

[25] At the termination hearing, FCM Atchison testified that termination of Mother's parental rights was in Child's best interest due to Mother's "lack of progress; they have been inconsistent with services, not able to provide stable housing or to meet [Child's] basic needs throughout the case. . . . There's an instability and safety issues that are still present." Transcript at 97. Also, CASA Hood testified that it was in Child's best interests that Mother's parental rights be terminated because she did not "think the stability is there. I think . . . the parenting skills still need to be addressed." *Id.* at 118.

[26] Based on the totality of the evidence as discussed and set forth in the trial court's order, including the recommendations of FCM Atchison and CASA Hood, and in light of our deferential standard of review, we conclude that the court's determination that termination is in Child's best interests is supported by clear and convincing evidence and is not clearly erroneous. *See In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013) (observing that "[r]ecommendations of the case manager . . . in addition to evidence the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence

that termination is in the child's best interests"), *reh'g denied*; *In re A.I.*, 825 N.E.2d 798, 811 (Ind. Ct. App. 2005) (testimony of court appointed advocate and family case manager, coupled with evidence that conditions resulting in continued placement outside the home will not be remedied, is sufficient to prove by clear and convincing evidence termination is in child's best interests), *trans. denied*.

## *Conclusion*

[27] We conclude that the trial court's judgment terminating the parental rights of Mother is supported by clear and convincing evidence. We find no error and affirm.

[28] Affirmed.

Friedlander, J., and Riley, J., concur.